**Leah B. WOSKOB, Appellee,**

v.

**Victor M. WOSKOB, Appellant.**

**Leah B. Woskob, Appellant,**

v.

**Victor M. Woskob, Appellee.**

Superior Court of Pennsylvania.

Argued Oct. 1, 2003.

Filed Feb. 20, 2004.

---

Steven S. Hurvitz, State College, for Leah Woskob.

Daniel J. Dugan, Philadelphia, for Victor Woskob.

Before: STEVENS, ORIE MELVIN and BOWES, JJ.

BOWES, J.

¶ 1 The estate of Victor Woskob ("Appellant") appeals from the trial court's De-

cember 19, 2002 order and judgment awarding Leah Beth Woskob ("Mother") $23,824.50 in child support arrears and $473.67 for unreimbursed medical expenses. Mother also cross-appeals from the December 19, 2002 order. We affirm.

¶ 2 This support proceeding has a long and torturous procedural history. The marriage between Mother and Victor Woskob ("Father") produced four children: Victor Jr., Ashlee, Jonathan, and Alex. Prior to the parties' January 1997 separation, Mother had a fifth child, Tristan, who subsequently has been determined not to be Father's biological child. The parties now agree that Father was not responsible for Tristan's support. However, on January 30, 1997, Mother filed a petition seeking support for herself and all five children. On March 4, 1997, the court ordered Father to pay $4,000 per month in support of the four youngest children, Ashlee, Jonathan, Alex, and Tristan. The oldest child, Victor, Jr., resided with Father. Both parties appealed this order and *de novo* hearings were held before the trial court.

¶ 3 Prior to resolution of the *de novo* appeal, on April 23, 1997, Father filed a petition to modify his support order alleging that he involuntarily was terminated from employment with his parent's company, A.W. & Sons, Inc., on April 8, 1997. Subsequent support hearings were held on June 23, 1997, September 23, 1997, and May 5, 1998. During these hearings, Father was granted temporary custody of Jonathan and Ashlee, and he sought support from Mother for the two children. Prior to the trial court's resolution of the pending support issues, Father died unexpectedly on January 13, 1999. On January 25, 1999, the trial court terminated Father's support obligation, and based on the initial March 4, 1997 order, it calculated Father's total support arrearage to be $81,838.41. This amount, which incorrectly included a support obligation for Tris-

tan, was based on Father's fixed annual salary of $75,000 earned in 1996 and miscellaneous income from rental property. The calculation did not account for advances that Father received from his employer in 1996 because the employer treated the advances that accrued in 1996 as loans. However, prior to 1996, the advances, which in reality were forgiven allowances, were reported as a salary bonus.

¶ 4 Father's estate appealed to this Court, and upon stipulation of the parties, we remanded for further proceedings to determine Father's support obligation. After subsequent hearings, the trial court entered a detailed order on July 10, 2002, vacating the January 25, 1999 order and directing the domestic relations officer to calculate Father's obligation for the period between January 30, 1997, and April 8, 1997, the date Father was terminated, using Father's actual salary of $75,000 and his additional miscellaneous income. The order also directed the domestic relations officer to calculate the obligation for the period between April 8, 1997, and January 13, 1999, using the assessed earning capacity of $59,000 plus miscellaneous income. In addition, the trial court assessed Mother's net earning capacity to be $1,516.66 per month between January 30, 1997, and January 13, 1999. The trial court also accounted for $157,434.61 gross income Mother earned during that period. Finally, the court credited Appellant $10,338.99 for support Father had paid prior to his death. Based on these figures, the court entered an order on July 17, 2002, concluding that Father owed no support arrearages as he had overpaid Mother in the amount of $4,563.76.

¶ 5 Thereafter, Appellant filed a motion seeking clarification of the July 17, 2002 order and requesting to be reimbursed for the overpayment. Mother countered with a motion for reconsideration. On Novem-

ber 26, 2002, the trial court entered an amended order that sustained its previous determination regarding Father's actual earnings and assessed earning capacity but applied an upward adjustment to Father's support obligation under Pa.R.C.P. 1910.16–6(e) because Mother was burdened by an exceptionally high mortgage on the marital residence. Based on these determinations, the court entered an order on December 19, 2002, calculating Father's arrears to be $24,298.17. This appeal and cross-appeal followed.

¶ 6 Appellant raises a single issue on appeal: whether the trial court erred in adjusting the basic support obligation according to Pa.R.C.P.1910.16–6(e) to account for the unusually high mortgage payment on the marital residence.

¶ 7 In her cross-appeal, Mother raises two issues: 1) whether the trial court erred in calculating Father's support obligation on the assessed earning capacity of $3,195 per month when prior to the parties' separation, Father earned in excess of $200,000 per year, including bonuses, working for his parents; and 2) whether the trial court erred in assessing a gross earning capacity of $28,000 per year for Mother in contravention of the nurturing parent doctrine.

¶ 8 We address Mother's arguments first. We review a court's determinations regarding support orders for an abuse of discretion. *Isralsky v. Isralsky,* 824 A.2d 1178 (Pa.Super.2003). In this context, we have defined an abuse of discretion as follows:

> An abuse of discretion is not merely an error of judgment, but rather a misapplication of the law or an unreasonable exercise of judgment. A finding that the trial court abused its discretion must rest upon a showing by clear and convincing evidence, and the trial court will be upheld on any valid ground.

*Id.* at 1186. Hence, the calculation of a support order largely is within the discretion of the trial court.

¶ 9 At the outset, we note that a person's support obligation is determined primarily by the parties' actual financial resources and their earning capacity. *Hoag v. Hoag,* 435 Pa.Super. 428, 646 A.2d 578 (1994). Although a person's actual earnings usually reflect his earning capacity, where there is a divergence, the obligation is determined more by earning capacity than actual earnings. *See DeMasi v. DeMasi,* 408 Pa.Super. 414, 597 A.2d 101 (1991). Earning capacity is defined as the amount that a person realistically could earn under the circumstances, considering his age, health, mental and physical condition, training, and earnings history. *Gephart v. Gephart,* 764 A.2d 613 (Pa.Super.2000).

¶ 10 Instantly, Mother asserts that the trial court erred in assessing Father's earning capacity to be $59,000 per year because Father conspired with his parents to reduce his support obligation by mischaracterizing advances he received in 1996 as a loan rather than a salary bonus. Essentially, Mother argues that the trial court should have considered this income in its calculation of the arrears. We disagree.

¶ 11 This issue concerns the following facts. Prior to the parties' separation, both Mother and Father worked for A.W. & Sons. In addition, Mother and Father owned two businesses: Woskob Legends Partnership and Downtown Rental Center, entities that maintained contracts with A.W. & Sons and which grossed nearly $38,000 per month. Further, Mother owned Designer Galleries, Inc., a corporation formed by Father's mother that was transferred to Mother in 1995. Prior to the separation, A.W. & Sons funded De-

signer Galleries and Mother's $54,000 annual salary.

¶ 12 In 1993, 1994, and 1995, Father's base salary of $50,000 was enhanced by salary bonuses that made his annual salary more than $200,000. As discussed *infra*, these bonuses were an accounting tool to recognize the substantial advances that Father had issued to himself as president of A.W. & Sons to subsidize the couple's lavish lifestyle. In November 1996, Father's annual salary increased to $75,000; however, A.W. & Sons began treating Father's periodic advances as loans rather than a salary bonus.

¶ 13 After the parties separated, Father was terminated from A.W. & Sons, and A.W. & Sons stopped funding Designer Gallery. A.W. & Sons also canceled its contracts with the businesses owned by Mother and Father. Following his termination, Father accepted a position operating a crane for an excavating company for $9.00 per hour. Mother did not return to the work force.

¶ 14 Mother's claim can be separated into two issues: first, whether the cash advances that accrued in 1996 should have been imputed to Father's salary earned that year, and second, whether the trial court erred in assessing Father's earning capacity to be $59,000 per year despite the fact the he earned more than $200,000 during each of the three previous years, and he allegedly conspired to reduce his support obligations.

¶ 15 As to Mother's contention that the court erred in not imputing the advances that the couple received in 1996 to Father's salary for purposes of the support order, we disagree. First, we observe that the bonuses Father had received in the three previous years were not based on his job performance, and the employer had no contractual obligation to award a bonus for 1996. *Cf. Fichthorn v. Fichthorn*, 368 Pa.Super. 305, 533 A.2d 1388 (1987) (while affirming trial court's discretion to impute future bonuses to father employed by family-run business, we observed that bonuses were not guaranteed and father could seek modification if bonuses ceased). The bonuses merely were an accounting tool to report funds that the couple had removed from the company during the course of their employment for their personal use and benefit. Leo DeLorenzo, the General Manager of A.W. & Sons, testified that these debts were offset by reporting them as Father's bonus and Mother's salary at Designer Gallery. N.T. Support Hearing, 5/5/98, at 155–56, 159, 163; N.T. Support Hearing, 2/29/97, at 215. According to Mr. DeLorenzo, prior to the end of the calendar year, the accountants would calculate Father's bonus commensurate to the amount of cash the couple had taken from the company that year. N.T., 2/29/97, at 215; N.T., 5/5/98, at 155–56. Then, A.W. & Sons would cut a payroll check for Father, less the usual deductions for federal and state taxes, and the net payment was applied to offset the couples' debt owed to the company. N.T., 2/29/97, at 215. The check stub would reveal the total offset; however the draft itself would be made out for zero cents. N.T., 5/5/98, at 193. This occurred between 1993 and 1995. *Id.*

¶ 16 At first glance, our conclusion in *Fichthorn, supra*, appears to control our disposition in this case; however, upon closer examination, it is clear that *Fichthorn* is not dispositive of this issue. The father in *Fichthorn* was employed by his family's hat business wherein he earned an annual salary of $86,842.00, $95,814.00, and $73,000.00, respectively, between 1984 and 1986. The annual salaries included substantial bonuses. For example, "[T]he $73,000.00 figure for 1986 was comprised of a base salary of $50,000.00 and a bonus of $23,000.00." *Id.* at 308, 533 A.2d 1388. The trial court concluded that "[g]iven the history of said bonuses, the Court believes

that $73,000.00 is a realistic indication of Mr. Fichthorn's earnings." *Id.* On appeal, Mr. Fichthorn argued that his earning capacity should not reflect future bonuses because they would be granted at the whim of his employer and were not part of his guaranteed salary. We disagreed, but in affirming the trial court, we observed that if the father did not receive bonuses in the future, he was entitled to petition the court to modify the support order.

¶ 17 *Fichthorn* is distinguishable on several fronts and did not concern the identical issue before us in this matter. The issue in that case addressed the speculative nature of future bonuses and whether the trial court abused its discretion by assuming that the bonuses would continue in light of the father's failure to provide evidence that the bonuses would be discontinued. However, the issue in the instant case is whether the trial court abused its discretion in failing to impute a non-existent salary bonus to Father's 1996 earnings simply because his employers chose to grant bonuses the previous three years. Unlike the issue we confronted in *Fichthorn*, this issue does not implicate the speculative nature of the bonuses. Rather, it implicates the trial court's discretion to conclude that "[i]n 1996, [Father's] parents treated any advances as loans, instead of bonuses. As such, they cannot be considered income." Trial Court Opinion, 7/10/02, at 6. Accordingly, our holding in *Fichthorn* is not dispositive of this issue.

¶ 18 A sister jurisdiction decided a case under similar facts, and we employ its reasoning herein. In *Bistrian v. Bistrian,* 176 Misc.2d 556, 672 N.Y.S.2d 976 (N.Y.Sup.1998), the Supreme Court of New York imputed $2,500 to the father's yearly income to account for bonuses that he customarily received from his parent's business prior to the parties separation. In that case, the father worked as a laborer earning $54,841.00 at his family's gravel

and cement business. Prior to his separation from the mother, the father's business provided him with periodic raises and a yearly Christmas bonus of $2,500. However, during the year following the parties' separation, the father did not receive a raise or his customary bonus. The court found that the father failed to explain why the raises and bonuses stopped following the commencement of the support action. Further, the court found that the father's testimony concerning his earnings was evasive and condescending. Consequently, the trial court imputed an additional $2,500 to the father's yearly income in calculating his support obligation.

¶ 19 In the case *sub judice,* Father provided the trial court with an adequate explanation as to why his parents treated the advances as a loan in 1996. When Father's parents realized the extent to which Father and Mother were draining their company of capital, they decided that A.W. & Sons would no longer subsidize the couples' lavish lifestyle and that no further salary advances would follow to offset the debts owed to the company. *Id.* at 217. Instead, Father and Mother were placed on a budget funded by their salaries and their holdings in the Downtown Rental Center and the Woskob Legends Partnership. N.T., 5/5/98, at 177. Father's parents informed the parties of their decision to stop the couples' unfettered misappropriation of company funds on September 20, 1996, more than three months before the parties' separation. In light of this evidence, the trial court did not commit an abuse of discretion by omitting the advances accrued in 1996 in its calculation of Father's arrearage.

¶ 20 Next, we address whether Father conspired with his parents to circumvent his support obligation by terminating his employment and accepting a position operating heavy machinery for

$9.00 per hour. It is settled law that a party cannot voluntarily reduce his earnings in an attempt to circumvent his support obligation. *Weiser v. Weiser*, 238 Pa.Super. 488, 362 A.2d 287 (1976). In fact, we view any sudden reduction in income with suspicion. *Perlberger v. Perlberger*, 426 Pa.Super. 245, 626 A.2d 1186 (1993). Where a party assumes a lower paying job or willfully fails to obtain appropriate employment, the support obligation is determined by his assessed earning capacity. *Portugal v. Portugal*, 798 A.2d 246 (Pa.Super.2002).

¶ 21 In *Isralsky, supra*, this court found that the record supported the trial court's determination that the father actively sought to reduce his support obligation. In that case, the father operated his own business for a twenty-eight-month period following the parties' separation and his termination from employment with Osh-Kosh B'Gosh. During this period, he sought minimal outside employment opportunities. Eventually, in August 2001, the father obtained a position earning $80,000 per year working for Williams–Sonoma in California.

¶ 22 Although the father made substantially less during the period he operated his own business, the trial court assessed his earning capacity at $80,000 for the entire twenty-eight months. The trial court reasoned as follows: "[It] did not believe Husband's testimony and evidence with regard to his search for employment and believed that at all times relevant he was engaging in a course of conduct designed to reduce his earnings/earning capacity so as to minimize his financial obligation to Wife and his children ...." *Id.* at 1188. On appeal, we affirmed the trial court's exercise of discretion.

¶ 23 Similarly, in *Lee v. Lee*, 608 So.2d 1383 (Ala.Civ.App.1992), the Alabama Court of Appeals upheld the trial court's decision to impute a monthly income of $2,000 notwithstanding a father's termination from his job as an insurance agent because of alleged misconduct. The trial court found that the evidence adduced at trial demonstrated that the father voluntarily quit. The father's manager testified that the termination was mutually agreed upon, and the termination notice did not reflect that the father was fired for wrongdoing. Accordingly, the appeals court affirmed the trial court's determination.

¶ 24 In support of her claim that Father conspired to circumvent his support obligation, Mother submitted the testimony of Attorney James Bryant, Father's previous divorce lawyer, to demonstrate a common plan between Father and his parents to reduce Father's support obligation. Attorney Bryant testified as follows:

> Specifically Helen [Father's mother] decided to take a hard, real hard line and turn off the spigot, the financial spigot and/or pull the props out from under Victor to make sure Leah wouldn't get anything with the understanding that when the case was over she advised me that Victor would get everything back.

N.T. Trial, 9/29/97, at 55. Moreover, Mr. Bryant testified that Helen Woskob informed him "[t]hat nothing that she and Victor or Alex ... had worked very hard for ... should ever [be] used to ... benefit [Mother], directly or indirectly." *Id.* at 50.

¶ 25 However, Mr. Bryant also testified that he was not part of any discussions regarding a scheme to terminate Father as a means to avoid Father's child support obligation and that he was unaware of Father's firing until after it had happened. *Id.* at 48–49. Further, Mr. Bryant did not identify Father either as a knowing member of any alleged conspiracy or condoning his mother's putative position. Indeed, Mr. Bryant explained that "[Father] was

the only reasonable one in the litter." *Id.* at 62.

¶ 26 Moreover, the following evidence supports Father's position that he was fired for poor performance. Mr. DeLorenzo testified that by April 1997, Father had become withdrawn, inattentive, and unresponsive to A.W. & Sons' business needs. N.T., 2/29/97, 240–41. Specifically, Father completed unauthorized renovations to apartment buildings despite clear directions to the contrary, and in the process, he ignored more pressing problems with the building's elevator and roof systems. N.T., 5/5/98, at 184–85. In addition, Father abused tenants' security deposits by withdrawing the funds maintained in escrowed accounts to pay down the company's debts. N.T., 5/5/98, at 177.

¶ 27 Unlike the fathers in the above referenced cases, Father herein was able to present competent evidence demonstrating that he did not conspire to terminate his employment or sit idle in the face of his family's financial hardship. Indeed, following his termination, Father utilized his knowledge as a heavy machine operator and secured the most lucrative employment he could find under difficult circumstances by agreeing to operate a crane for a business associate. As the record sustains the trial court's finding that Father did not conspire with his parents to usurp his child-support obligations, the court's conclusion is not an abuse of discretion.

■ ¶ 28 Just as we disagree with Mother's claim that the trial court erred in failing to impute to Father's salary the advances that accrued in 1996, we cannot agree with Mother's assertion that Father's assessed earning capacity should reflect the $200,000 retroactive salary bonuses that he received in 1993, 1994, and 1995. Since Father's elevated salary during this period is totally disproportionate to his actual earning capacity, his support obligation should reflect his earning capacity rather than his actual earnings. *See De-Masi, supra* (where divergence exists between actual earnings and earning capacity, support obligation determined more by earning capacity than actual earnings because earning capacity is more indicative of ability to pay support than actual earnings).

¶ 29 In calculating Father's support obligation, the trial court observed that Father's salary at A.W. & Sons was far greater than his actual earning capacity and that his salary for operating the crane was less than his actual earning capacity. Accordingly, the court disregarded the actual amount compensated at either job, and based on Father's age, education, experience, and training as of the date of the hearing, it assessed Father with an earning capacity of $59,000. These are the proper factors to consider under the prevailing case law. *See Gephart, supra; Commonwealth ex rel. Schofield v. Schofield,* 173 Pa.Super. 631, 98 A.2d 437 (1953) (earning capacity is measured as of date of support hearing).

¶ 30 At the time of the support hearing, Father was thirty-six years old and in good health. He had a high school education and completed some college courses. In addition, Father had a substantial work history. Prior to working for his parents, Father owned and co-managed two businesses. While working for his parents as President of A.W. & Sons, Father oversaw all aspects of the company's daily operations and managed two businesses he and Mother owned jointly. Based on these factors, Father was assessed an earning capacity of $59,000. Since the trial court considered the proper factors, we conclude that its assessment is not tantamount to an abuse of discretion. *See Isralsky, supra.*

■ ¶ 31 Next, Mother contends that under the nurturing-parent doctrine, the trial court should have assessed her

earning capacity at zero. According to this doctrine, the parent who stays at home to care for the couple's children should be excused from support payments. *Frankenfield v. Feeser*, 449 Pa.Super. 47, 672 A.2d 1347 (1996). The doctrine considers such factors as the age and maturity of the children, the parties' financial resources, and the custodial parent's desire to stay at home and nurture the child. *Id.* In addition, the trial court may consider the parents' employment history and prior practice with regard to caring for their children. *Id.*

¶ 32 Instantly, the trial court elected not to apply the doctrine because the parties' three minor children attended school during the day and Mother's youngest child was not Father's responsibility. Moreover, the court observed that following Father's termination and the loss of income from their side-businesses, Mother's decision to remain at home strained the family's financial resources. In addition, the trial court found that Mother had a long work history, which, although not dispositive of the issue, is a significant factor in light of Mother's election to work outside the home when the couple's older children were of similar ages.

¶ 33 Thus, the court reasoned that it would be inappropriate to apply the nurturing-parent doctrine and allow Mother to be assessed a zero earning capacity. Instead, the trial court considered Mother's age, education, and past work experience and assessed her earning capacity to be $28,000 per year. The court observed, "Leah has secretarial skills, some managerial skills, and extensive work experience." Trial Court Opinion, 7/10/02, at 13. We believe the trial court's calculation of Mother's earning capacity is reasonable and supported by the law. *See Frankenfield, supra; Gephart, supra.* Hence, Mother's argument is without merit.

¶ 34 Next, we address Appellant's argument that the trial court improperly adjusted Father's support obligation to account for the mortgage payment on the marital home. The following facts are pertinent to our review. In assessing Father's final support obligation, the trial court applied a discretionary enhancement under Pa.R.C.P.1910.16–6(e) to deviate from the standard guideline support range because the monthly mortgage on the marital home greatly exceeded Mother's resources. Rule 1910.16–6(e) provides as follows:

**(e) Mortgage Payment.** The guidelines assume that the spouse occupying the marital residence will be solely responsible for the mortgage payment, real estate taxes, and homeowners' insurance. Similarly, the court will assume that the party occupying the marital residence will be paying the items listed unless the recommendation specifically provides otherwise. If the obligee is living in the marital residence and the mortgage payment exceeds 25% of the obligee's net income (including amounts of spousal support, APL and child support), the court may direct the obligor to assume up to 50% of the excess amount as part of the total support award. For purposes of this subdivision, the term "mortgage" shall include first mortgages, real estate taxes and homeowners' insurance and may include any subsequent mortgages, home equity loans and any other obligations incurred during the marriage which are secured by the marital residence.

¶ 35 Instantly, the monthly mortgage payment is $4,800, which greatly exceeds twenty-five percent of Mother's monthly income. Therefore, the trial court assessed Father with one-half of the excess mortgage obligation using the standard guideline.

¶ 36 Initially, Appellant asserts that the trial court erred in delegating this determination to domestic relations staff. Appellant argues that the rule requires a discretionary finding that the enhancement is proper under the facts of the case prior to applying it. In addition, Appellant contends that the trial court improperly assumed that the fifty-percent increase was mandatory rather than a limit. The record belies these assertions.

¶ 37 The trial court explained its application of rule 1910.16–6 in its opinion as follows:

According to the record, [Mother's] monthly mortgage payments are approximately $4,800. The Court is satisfied, using the parties' earning capacities and net contributions established in the Court's Opinion and Order dated July 10, 2002, that Leah's mortgage payments greatly exceed 25% of her net monthly income.[1]

Neither party has provided the Court with case law governing the application of Rule 1910.16–6(e), and this court has found no case law which would aid in its determination of whether Rule 1910.16–6(e) applies to this case. Based upon its reading of the Rule and the accompanying explanatory comment,[2] however, the Court determines Rule 1910.16–6(e) [applies].

[1] The Court bases this finding on the fact that [Mother's] net monthly income would need to be at least $18,000 for a mortgage payment of $4,500 not to exceed 25% of her net monthly income.

[2] The Explanatory Comment for Rule 1910.16–6(e) states: "New subdivision (e) ... has been modified only to provide some uniformity and certainty as to what constitutes an unusually high mortgage payment that may justify an upward adjustment to the basic support obligation. The change is intended only for the benefit of the obligee living in the marital residence."

Trial Court Opinion, 11/26/03, at 8–9. Thus, the court explained that it, not the domestic relations officer, found that the mortgage on the marital property greatly exceeded Mother's net monthly income, and that it deemed the enhancement proper under the circumstances. Further, the court apparently applied the maximum percentage amount in light of the high monthly mortgage.

¶ 38 Next, Appellant asserts that Mother is not entitled to the enhancement for the entire period because she resided in Florida for six months during the period at issue. Rule 1910.16–6(e) expressly states that the enhancement only applies to the period that the obligee is living in the marital residence. Although Appellant claims that Mother does not dispute the above allegation, there is no citation to the certified record in Appellant's brief to substantiate such allegations. Moreover, our independent review of the record did not uncover support for such a bald assertion. "For purposes of appellate review, what is not of record does not exist." *Rosselli v. Rosselli*, 750 A.2d 355, 359 (Pa.Super.2000). Hence, Appellant's claim fails.

¶ 39 Finally, Appellant contends that the trial court abused its discretion in applying Rule 1910.16–6(e) without regard for the fact that Father had custody of three of the couples' four children at varying periods following the separation. Mother counters with the argument that Rule 1910.16–6(e) may be invoked merely on the basis of an obligee's possession of the marital home. According to Mother, it is irrelevant whether she had custody of all of the children or a single child as long as she was an obligee in possession of the marital home.

¶ 40 Mother's argument is persuasive. As noted above, the trial court may apply the enhancement where a support obligee resides in the marital home and the mortgage on that property exceeds one-quarter of the obligee's net income. Hence, Rule 1910.16 does not contain any custody re-

quirements beyond satisfying the status of a support obligee.

¶ 41 Neither party has referred us to any authoritative precedent other than the rule itself, and after exhaustive independent research, we were unable to find any case law dispositive of this issue. With no precedent to support Appellant's position, we cannot create an exception where the Supreme Court has declined to do so. Thus, in light of the trial court's express reasoning, and absent authority to the contrary, we affirm the trial court's determination.

¶ 42 Judgment affirmed.