J-A31027-14

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| M.W. | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellee | |
| v. | |
| C.S.W. | |
| Appellant | No. 144 MDA 2014 |

Appeal from the Order Entered December 23, 2013
In the Court of Common Pleas of Dauphin County
Domestic Relations at No(s): 2012-CV-03589-SU
PACSES NO. 148113311

BEFORE:  BOWES, J., OTT, J., and STABILE, J.

MEMORANDUM BY OTT, J.:                    **FILED DECEMBER 09, 2014**

C.S.W. appeals from the order entered on December 23, 2013,

ordering C.S.W. to pay child and spousal support.[1]  Following a thorough

_____

[1] Our standard of review for a support orders is well-settled:

> When evaluating a support order, this Court may only reverse
> the trial court's determination where the order cannot be
> sustained on any valid ground. We will not interfere with the
> broad discretion afforded the trial court absent an abuse of the
> discretion or insufficient evidence to sustain the support order.
> An abuse of discretion is not merely an error of judgment; if, in
> reaching a conclusion, the court overrides or misapplies the law,
> or the judgment exercised is shown by the record to be either
> manifestly unreasonable or the product of partiality, prejudice,
> bias or ill will, discretion has been abused.

***Summers v. Summers***, 35 A.3d 786, 788 (Pa. Super. 2012) (citation
omitted).
*(Footnote Continued Next Page)*

review of the submissions by the parties, the relevant law, and the certified record, we affirm on the basis of the trial court opinion.

We note that there are significant problems with both C.S.W.'s brief and the Pa.R.A.P. 1925(b) statement. The totality of these problems renders us unable to conduct a proper legal analysis of C.S.W.'s arguments as presented.[2]

Similarly, the 1925(b) statement[3] submitted by C.S.W. was 25 pages long, containing 50 issues and sub-issues. While we have the authority to find all issues waived when such a 1925(b) statement has been filed,[4] here, the trial court distilled the claims to three properly preserved and argued issues. They address questions of M.W.'s income and earning capacity, unreported income and extracurricular expenses, and allocation of support. Because the trial court has addressed those issues, our ability to conduct appellate review has not been totally hindered by C.S.W.'s deficient

*(Footnote Continued)* ────────────────

[2] *In re A.B.*, 63 A.3d 345 (Pa. Super. 2013) (meaningful review not possible when appellate court must guess what issues are being appealed).

[3] Pa.R.A.P. 1925(b) refers to this document as a "**concise** statement of errors complained on appeal." (emphasis added).

[4] *See Jiricko v. Geico Ins. Co.*, 947 A.2d 206 (Pa. Super. 2008) (waiver appropriate for five page incoherent submission); *Tucker v. R.M. Tours*, 939 A.2d 343 (Pa. Super. 2007), *aff'd* 977 A.2d 1170 (Pa. 2009) (waiver appropriate for 26 page, 76 paragraph plus exhibits submission); *Jones v. Jones*, 878 A.2d 86 (Pa. Super. 2005) (waiver appropriate for filing 7 page, 29 paragraph unmanageable statement).

submissions. ***See Kern v. Kern***, 892 A.2d 1 (Pa. Super. 2005) (Appellate court may address issues when failure to follow appellate rules does not hamper review). Accordingly, we limit our review to those issues identified and addressed by the trial court.

Our review of the certified record and relevant law reveals no abuse of discretion or errors of law attendant to the rulings on those issues identified and addressed by the trial court. ***See*** Trial Court Opinion, 4/16/2014, at 5-11. Accordingly, we adopt the trial court's well-reasoned decision as dispositive of the discernible issues raised in this appeal. The parties are directed to attach a copy of the trial court's opinion in the event of further proceedings.

Order affirmed.


Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 12/9/2014

Copies Mailed ___4-16-14___
___MER___

| | |
|---|---|
| M.W., | : IN THE COURT OF COMMON PLEAS |
|     Plaintiff-Obligee | : DAUPHIN COUNTY, PENNSYLVANIA |
| | : |
| v. | : NO. 999 DR 2012 |
| | : PACSES NO. 148113311 |
| | : |
| A.W. a/k/a C.W., | : |
|     Defendant-Obligor | : CIVIL – SUPPORT |

## MEMORANDUM OPINION

Before the court is the appeal filed by support obligor AW, a/k/a CW, from an order directing she pay child and spousal support.[1] This opinion is offered pursuant to Pa.R.A.P. 1925(a).

### Background

The parties CW and MW were married in 1994 and are the parents of three children (dates of birth 9/95, 5/97 and 5/00).[2] CW is their father and the obligor in these proceedings and MW is their mother and obligee. Obligee did not work outside the home for an eleven and one-half year period while the children were young. Once they were older, she began part-time employment in various positions as a daycare provider or substitute teacher at the elementary school level. (See N.T. 6) CW has been employed full-time by the Commonwealth for all relevant times.

On June 13, 2012, following their separation, obligee initiated proceedings seeking child and spousal support. Following an office conference, I signed two orders July 9, 2012, as recommended by the Dauphin County Domestic Relations Section conference officer. The first, effective June 13 through July 31, 2012 directed that obligor pay obligee child support of $984 per month plus $90 per month on arrears. The second, effective August 1, 2012, directed obligor pay child and spousal support of $1,312 per month plus $120 per month on arrears.

---

[1] According to obligor's Statement of Errors, AW was born male but considers herself female and is in the process of legal formalities to become recognized as female, including a name change to CW. This court will thus identify obligor by her chosen name and gender.

[2] The oldest child is not yet emancipated.

1

For the purpose of calculating the orders, the officer assigned monthly net incomes of $3,196 to obligor and $1,849 to obligee, respectively. Obligor's income was based upon his wages with the Commonwealth. Obligee's income was based upon her wages working full-time as a daycare provider at a daycare center. Obligee began working there in August 2011 making $12 per hour (40 hours per week), a yearly gross income of $24,960, or an $1,849 monthly net income. The conference officer rejected obligor's argument that obligee be held to an earning capacity as a full-time teacher since she had never held that position. The conference officer also rejected obligor's argument seeking to add to obligee's income monies she made working at sporting events in which the parties' children participated. (Obligor's Notice of Appeal Exbt. A)

Obligor sought *de novo* review claiming obligee's income should have been based upon an earning capacity of $40,000 and $50,000 per year as a full-time certified teacher. Obligor also sought to include in her income $2,000 per year she allegedly made working at sporting events. (Obligor's Notice of Appeal Exbt. B) At a November 1, 2012 *de novo* hearing, obligee testified she had a Bachelor's degree in early childhood education and a Pennsylvania teaching certificate though it had lapsed. In order to reactivate her certificate, and become eligible to teach full-time, obligee needed to complete 180 hours of continuing professional education or six college credits. Obligee was pursing the former method and believed she had about 90 hours complete as of the hearing. Obligee testified her goal was to complete her hours by September 2013. Obligee also testified that prior to working for the daycare center, she was a substitute teacher for five years in a local school district earning between $95 and $105 per day, when called to work.

At the conclusion of the November 1, 2012 hearing, I issued an order denying obligor's appeal, however, I directed as follows: "Case is remanded to the Domestic Relations Office to schedule a support conference for September 2013, at which time it is anticipated that mother [obligee] will have completed all necessary requirements to be reactivated as a certified teacher." Obligor did not seek further appeal to the Superior Court.

On February 12, 2013, obligor filed a petition to modify her support obligation. Following a conference, I signed the officer's recommended order March 21, 2013, which

2

slightly reduced obligor's monthly support obligation to $1,280 and also directed she pay $120 per month on arrears. For the purpose of calculating the order, the officer assigned monthly net incomes of $3,148 to obligor and $1,815 to obligee. The officer again based obligee's income upon her full-time daycare center wages. He also declined to include in obligee's income sporting event monies. (Obligor's Notice of Appeal Exbt. E) Obligor again sought *de novo* review and following a hearing, I denied obligor's appeal, July 19, 2013. Obligor did not seek further appeal to the Superior Court.

On September 6, 2013, the parties attended the remand conference as directed in my November 1, 2012 order. Following that conference, I signed the officer's recommended order September 17, 2013 (effective September 6, 2013), which increased obligor's monthly support obligation to $1,348, plus $120 per month on arrears. The order was allocated $992 for child support, $116 for spousal support and $240 as a mortgage contribution. The order additionally directed that the parties pay for all extracurricular expenses in proportion to their net incomes: 65% for obligor and 35% for obligee. For the purpose of calculating support, the conference officer assigned monthly net incomes of $3,219 to obligor and $1,840 to obligee. The conference officer again rejected obligor's argument that obligee be held to an earning capacity as a full-time elementary level teacher. Obligee's income was again based upon her full-time wages at the daycare center between December 23, 2012 and August 17, 2013. During that period, she averaged $963 gross per bi-weekly period, or $25,038 gross per year, which translated to an $1,840 monthly net income. (Obligor's Notice of Appeal Exbt. H)

Obligor sought *de novo* review and I held a hearing December 18, 2013. The primary issue raised involved obligee's income and earning capacity. The relevant evidence elicited was as follows: As of the date of the hearing, obligee, then 50 years old, had been credited by the Commonwealth's Department of Education with 84 or 86 of her 180 continuing education hours towards reactivation of her teacher certification. (N.T. 15, 19-20) In addition, she claimed that since the November 1, 2012 hearing, she had accrued approximately 40 more hours from working at her daycare center job, though she noted those credits had not been reported by the daycare center and was the subject of an employment dispute. (N.T. 15) Obligee had been fired

3

from the daycare center October 4, 2013 due to absenteeism, which she claimed was at least partially the result of her need to appear in court so many times.[3] (N.T. 11-12) Obligee elected to reactivate her teaching certificate via continuing education hours because she could obtain those credits while she was working and because they were free. She did not take college courses for credits due to the additional expense and because she lacked the time due to having custody of the parties' children one-hundred percent of the time. (N.T. 10-11)

Immediately after her job was terminated at the daycare center, obligee applied for and was accepted by a substitute teacher service to work in thirteen local school districts. (N.T. 12) By the end of October 2013, obligee was working as a substitute four to five days per week, earning $80 to $100 per day (gross) depending upon the school district assigned. (N.T. 12-14, 16) Her most recent placement has been providing learning support at a local elementary school, which pays her $95 per day. This job offered the potential of becoming a long-term substitute position. (N.T. 16-17) Obligee anticipated that if that occurred, she would be able to accrue sufficient free continuing education hours to reactivate her elementary teaching certificate by the beginning of the 2014-2015 school year. (N.T. 16) That certificate would qualify her to teach grades K through 3. (N.T. 16)

Following the *de novo* hearing, I issued an order December 23, 2013 denying obligor's appeal. Obligor thereafter filed a timely appeal to the Superior Court currently pending.

## Legal Discussion

Following obligor's appeal, I directed she file a Concise Statement of Errors Complained of on Appeal. In response, obligor submitted a *25-page* statement in which she raises well over 50 issues and sub-issues.[4] I necessarily distill Obligor's non-concise Statement to the following issues: (1) the court erred by failing to hold obligee to a full-time earning capacity as a certified teacher; (2) the court erred by failing to include in obligee's income certain "under-the-table"

---

[3] She was denied unemployment compensation but was challenging that decision as of the *de novo* hearing. (N.T. 12)

[4] Obligor's Statement of Errors is in clear violation of the Rules of Appellate Procedure which direct that "[t]he Statement should not be redundant or provide lengthy explanations as to any error." Pa.R.A.P. 1925(b)(4)(iv).

4

monies; and (3) the court erred by allocating the support order. In addition, obligor raises numerous other issues which I address below in the miscellany section.

*Obligee's Income / Earning Capacity*

Obligor's primary reason for appealing is her claim that this court failed to hold obligee "to a standard of income for which she is capable of making." (Statement of Errors No. 11(f)) Before addressing the merits of this issue, however, I first address a related claim raised numerous times in obligor's Statement of Errors. Obligor asserts that both this court and the conference officer failed to hold obligee "accountable" or failed to "enforce" the terms of my November 1, 2012 order. (Statement Nos. 1, 2, 5, 6, 8) Obligor interprets that order as having affirmatively directed that obligee reactivate her teaching certificate within ten months, by September 2013. (See e.g. Statement No. 2, "The Plaintiff was Court Ordered to be Reactivated as a Certified Teacher by September 2013.") This is a clear misreading of my order, which specifically stated the case was remanded for a September 2013 support conference, "at which time it is anticipated that mother [obligee] will have completed all necessary requirements to be reactivated as a certified teacher." The language - "it is anticipated" – is not a directive, but an anticipation, or contemplation, of a potential future event, the occurrence or non-occurrence of which was the subject of the remand inquiry.

I thus turn to the merits of the earning capacity issue. Generally, parents have an absolute obligation to support their children and this obligation "must be discharged by the parents even if it causes them some hardship." Mencer v. Ruch, 928 A.2d 294, 297 (Pa. Super. 2007) (citations and internal quotation marks omitted). "[I]n Pennsylvania, a person's income must include his earning capacity, and a voluntary reduction in earned income will not be countenanced[.]" Id. "Where a party willfully fails to obtain appropriate employment, his or her income will be considered to be equal to his or her earning capacity[,]" not equal to his or her actual earnings. Ney v. Ney, 917 A.2d 863, 866 (Pa. Super. 2007) (citation omitted).

The applicable Support Guidelines addressing earning capacity are as follows:
**Rule 1910.16-2. Support Guidelines. Calculation of Net Income.**

5

### (d) Reduced or Fluctuating Income.

\* \* \*

(4) *Earning Capacity.* If the trier of fact determines that a party to a support action has willfully failed to obtain or maintain appropriate employment, the trier of fact may impute to that party an income equal to the party's earning capacity. Age, education, training, health, work experience, earnings history and child care responsibilities are factors which shall be considered in determining earning capacity. In order for an earning capacity to be assessed, the trier of fact must state the reasons for the assessment in writing or on the record. Generally, the trier of fact should not impute an earning capacity that is greater than the amount the party would earn from one full-time position. Determination of what constitutes a reasonable work regimen depends upon all relevant circumstances including the choice of jobs available within a particular occupation, working hours, working conditions and whether a party has exerted substantial good faith efforts to find employment.

Pa.R.C.P. 1910.16-2(d)(4).[5]

"[A] person's support obligation is determined primarily by the parties' actual financial resources and their earning capacity. Although a person's actual earnings usually reflect his earning capacity, where there is a divergence, the obligation is determined more by earning capacity than actual earnings." Baehr v. Baehr, 889 A.2d 1240, 1244-45 (Pa. Super. 2005) (citing Woskob v. Woskob, 843 A.2d 1247, 1251 (Pa. Super. 2004) (citations omitted)). "[A] person's earning capacity is defined not as an amount which the person could theoretically earn, but as that amount which the person could realistically earn under the circumstances, considering his or her age, health, mental and physical condition and training." Haselrig v. Haselrig, 840 A.2d 338, 340 (Pa. Super. 2003) (quoting Strawn v. Strawn, 664 A.2d 129, 132 (Pa. Super. 1995)).

The record supports that obligee be currently held to her actual earnings instead of being assigned an earning capacity as a fully certified, beginning elementary school teacher.[6] The

---

[5] The Rules of Civil Procedure promulgated by the Supreme Court, have the force of statute. Maddas v. Dehaas, 816 A.2d 234, 238 (Pa. Super. 2003), appeal denied, 827 A.2d 1202 (Pa. 2003).

[6] I note that as of the remand hearing (September 2013), obligee's income was based upon her daycare center earnings making $12 per hour, or $96 per day (gross). Her most current income as a substitute teacher, as of the *de novo* hearing (December 2013), was $95 per day (gross). As such, her most current income is reflective of the income upon which the most recent support order was based, and is thus still appropriate.

6

evidence presented to the court was that obligee did not work full-time as a teacher during the course of the parties' marriage. In August 2011, following their separation, obligee obtained full-time employment and has essentially worked full-time since then with one brief period of unemployment in October 2013. Obligee's actual gross yearly income of approximately $25,000, as of the September 2013 remand hearing, is an accurate reflection of her current earning capacity, given her age (50), her educational background (early childhood education), her part-time status and earnings history in the workforce as a daycare provider and/or substitute teacher for much of the last decade, and her lack of an active teaching certificate. With regard to her certification, I found obligee's testimony credible that she has been diligent in pursuing reactivation of her certificate via continuing education hours through her employment at the daycare center. I found credible as well the evidence that she should be able to complete her necessary hours during her current employment as a substitute teacher which should be accomplished by the beginning of the 2014-2015 school year.

Obligor asserts in her Statement of Errors that obligee has a history of working full-time as a teacher and that her income history so reflects. (Statement No. 10(a)) The record before this court, however, did not bear this out. The record instead reveals that obligee has had a recent history of mostly part-time work in teaching and daycare positions and that she has only had a history of full-time employment in positions within her field since August 2011.[7]

Obligor also raises numerous issues concerning the evidence presented by obligee upon which her income was based, complaining that this court (through the conference officer) was not provided with the required information to compute obligee's income. Obligor specifically complains that obligee failed to provide her 2012 income tax return (Statement No. 11(e); see also N.T. 9). Obligor also complains that obligee's income was erroneously based upon "unconventional methodology" whereby it was calculated using obligee's paystubs over a 34-week period. (Statement No. 14) As noted above, obligee's income was calculated based upon

---

[7] In support of her argument, obligor supplied to the court obligee's W2 income forms from 2006 through 2011. While these records were not presented at the *de novo* hearing and are thus not part of the record, they nevertheless fail to support obligor's argument. Instead, the W2s show obligee has never earned more than $19,000 during any of these years.

7

her full-time wages which were reflected on bi-weekly paystubs from the daycare center, between December 23, 2012 and August 17, 2013. During that eight-month period, obligee averaged $963 bi-weekly, or $25,038 gross per year ($1,840 net per month). (Obligor's Notice of Appeal Exbt. H) Under the Support Guidelines, this was clearly a proper and accurate method of income calculation. Pa.R.C.P. 1910.16-2(a) ("Monthly gross income is ordinarily based upon at least a six-month average of all of a party's income.") Obligor has not otherwise suggested how this income methodology is inaccurate or that obligee had income other than as reflected from her paystubs (outside of alleged sporting event income, addressed below).

*Unreported Income / Treatment of Extracurricular Expenses*

Obligor next argues that this court erred by excluding from obligee's income certain unreported money she allegedly made under-the-table from working at the children's sporting events. (Statement Nos. 11(b), (g), (h); 12(a)) She suggests that the decision by the conference officer to exclude this money from obligee's income was the result of overarching discrimination against her as a transgendered person. (Statement No. 11(l)) Obligor also complains that she was wrongly prevented from addressing this issue at the November 1, 2012 *de novo* hearing asserting that this court prematurely concluded that hearing when it raised issues of her sexuality in an attempt to embarrass her thus foreclosing obligor from arguing her case. (Statement Nos. 11(h), 12(a)) Obligor further complains that this court compounded its error of excluding sporting event income by requiring obligor to reimburse obligee for 65% of all her expenses related to the children's sporting events. (Statement Nos. 15(a), 16))

At the outset, I note that obligor failed to raise the issue of obligee's alleged under-the-table income at the December 18, 2013 *de novo* hearing. This court is cognizant that a *de novo* hearing amounts to a full consideration of the case anew; that is, the parties are not limited to the issues they can raise in a *de novo* hearing. See, D'Arciprete v. D'Arciprete, 470 A.2d 995, 996 (1984). While there is no limitation on what issues might be addressed at a *de novo* hearing, a party must nevertheless raise an issue and present evidence in support if he or she wishes the court to address it. Capuano v. Capuano, 823 A.2d 995, 1002 (Pa. Super. 2003) ("the very essence of a *de novo* hearing entails that parties be permitted to present evidence"). As obligor

8

presented no evidence whatsoever on this issue at the *de novo* hearing, this court considers it waived. Furthermore, to the extent obligor believed there were legal infirmities following the November 1, 2012 *de novo* hearing, her remedy was to seek an appeal. Since she did not, any potential issues obligor might have raised following that hearing have also been waived.

## Allocation

Obligor argues that it was error for this court to fail to direct that the September 17, 2013 support order be unallocated. (Statement No. 17) Under the Support Guidelines, an order for both child support and spousal support / *alimony pendente lite* may be unallocated or allocated; the court issuing such an order must consider whether to allocate such an award as well as the tax consequences of the final support award. Pa.R.C.P. 1910.16-4(f)(1). An unallocated support award including child support and spousal support / *APL* is taxable to the obligee as income and deductible to the obligor; where the order is allocated, the portion ordered as child support is neither taxable to the obligee nor deductible to the obligor. Pa.R.C.P. 1910.16-4(f)(2). The Support Guidelines assume that an order will be unallocated. Pa.R.C.P. 1910.16-4(f)(1) and 2005 Explanatory Comment. Where an order is allocated, "an adjustment shall be made to the award giving consideration to the federal income tax consequences of an allocated order as may be appropriate under the circumstances." Pa.R.C.P. 1910.16-4(f)(1). No consideration of federal income tax consequences shall be applied if the order is unallocated or the order is only for spousal support / *APL*. Id.

As noted at the *de novo* hearing, whether the September 17, 2013 order was unallocated or allocated was unclear; language within that order was internally inconsistent wherein it indicated at one place it was unallocated and at another it was allocated. (See N.T. 8) The Domestic Relations Section Director nevertheless clarified at the *de novo* hearing that the order was considered allocated. (N.T. 8) Given the assumption that a child and spousal support / *APL* order will be unallocated and given the further requirement that an allocated order must include consideration of federal tax consequences (which did not occur in this case), the order should have been issued as unallocated. Thus, when I re-obtain jurisdiction in this matter, the order will be retroactively amended (to September 6, 2013) to so indicate.

*Miscellaneous Issues*

Obligor raises many claims of error concerning the calculation of support arrived at by the conference officer and recommended to the court in arriving at the first two support orders I issued in this case, on July 9, 2012 and March 21, 2013, respectively. (Statement pp. 17-23) Amongst her allegations are that the conference officer erred by changing the income methodology used to arrive at the March 21, 2013 support order by failing to base income upon a six-month average (Statement Nos. 13, 14); the conference officer erred in the calculation of obligor's net income following the March 2013 conference by inaccurately multiplying her hourly income ($27.27) to arrive at a yearly gross income (Statement No. 14(e)); and the conference officer erred following both conferences by failing to explain how he arrived at the "monthly deductions" figures assigned to obligor and used in the Support Guideline Calculation form to determine the ultimate support obligation given that obligor's claimed monthly deductions were greater than those used by the officer (Statement Nos. 14(e)(2) (July 2012); 14(e)(5) (March 2013)). Obligor asserts the conference officer's methods of support calculation do not add up as they are "masked," "unseen," and "entirely invisible," and that this lack of transparency is "suspicious." (Statement Nos. 14(e)(3)-(5))

To the extent obligor believed there were legal infirmities with the calculation of support recommended by the conference officer, reduced to court orders on July 9, 2012 and March 21, 2013, her remedy was to raise all such issues by pursuing them upon *de novo* review and if still dissatisfied, to further pursue them on appeal to the Superior Court following *de novo* review. Clearly, any issues obligor had with the first two support orders issued in this case have long been waived.

Obligor also accuses both the Domestic Relations Section conference officer, before whom she appeared at three conferences, as well as this court, of treating her differently. (Statement No. 10) She claims that her transgender identity has prejudiced Domestic Relations Section staff and the court against her in all proceedings to date and that she has been discriminated against and marginalized as a person. (Statement No. 11(i)-(k)) As a result, she maintains that "each and every decision, exclusion and omission has been made for the benefit of

10

the [obligee]." (Statement No. 11(o)) It is unlikely that this court can convince obligor otherwise, but the factual and legal issues presented, concerning the determination of obligee's monthly net income, alleged unreported income, the allocation of support and all other issues raised, have been decided upon the merits, totally unrelated to obligor's gender.[8]

Accordingly, I entered my order December 23, 2013 from which obligor has appealed.

_April 16, 2014_
Date

Jeannine Turgeon, Judge

_Distribution:_

Nichole M. Walters, Esquire
(for MW)

CW

_April_ _16_, _2014_
I hereby certify that the foregoing is a true and correct copy of the original filed.
No. 999 M Term, 12

Prothonotary

---

[8] This court feels it necessary to address one particularly spurious claim raised by obligor in her voluminous Statement of Errors concerning a comment I made at the December 18, 2013 _de novo_ hearing. (Statement Nos. 11(i), (j)) At the outset of that hearing, I held a discussion with obligor's attorney about the status of her name change litigation. Obligor's counsel advised me that obligor was self-represented in that proceeding, which had been assigned to another judge. During the discussion, I recalled a name change case nearly identical to CW's in which our Supreme Court ultimately granted a name change from male to female. (Matter of McIntyre, 715 A.2d 400 (Pa. 1998)). I suggested obligor submit that case in her name change litigation in an effort to speed up the resolution of that action. (N.T. 2-3) In wrapping up my discussion, I concluded that I was offering such advice "[j]ust because I'm tired of having to deal with this problem." (N.T. 3) In her Statement of Errors, obligor views my statement as negative commentary on transgendered persons broadly and of her in particular. (Statement Nos. 11(i), (j)) Any fair reading of the context surrounding this comment reveals obligor's interpretation to be absurd. Clearly, it was offered not as a negative comment upon obligor's gender identity but rather to assist her name change efforts.

11