J-A34035-14

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| F.B. | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellee | |
| v. | |
| M.M.R. | |
| Appellant | No. 2006 MDA 2013 |

Appeal from the Order Entered October 8, 2013
In the Court of Common Pleas of Dauphin County
Domestic Relations at No: 00441-DR-12

BEFORE: FORD ELLIOTT, P.J.E., SHOGAN, and STABILE, JJ.

MEMORANDUM BY STABILE, J.:               **FILED MARCH 17, 2015**

Appellant, M.M.R., appeals *pro se* from the October 8, 2013 child and spousal support order entered in the Court of Common Pleas of Dauphin County.[1] Appellant contends the trial court abused its discretion by denying his petition for modification of support obligations, resulting in a judgment that was manifestly unreasonable. He further asserts trial court error for recognizing Egyptian documents relating to his marriage to Appellee, F.B., while discounting a purported Egyptian divorce certificate. We disagree and, therefore, affirm.

---

[1] Appellant also appealed from an order entered on September 24, 2013 in the Court of Common Pleas of Dauphin County holding him in contempt of the initial child support order entered on July 11, 2012. **See** 1846 MDA 2013.

In its opinion, the trial court set forth the procedural background and the factual background underlying this appeal, including summaries of the immigration issues and marital status as well as income and earning capacities. *See* Trial Court Opinion (T.C.O.), 10/8/13, at 1-8. We incorporate those portions of the October 8, 2013 opinion in this Memorandum as if fully set forth herein.

Appellant presents the following issues for our review:

I. Whether the trial court abused its discretion when it misapplied or overrode the law in denying Appellant's Petition for Modification?

II. Whether the trial court abused its discretion when it rendered a judgment that was manifestly unreasonable, based on bias, ill will, prejudice or partiality?

III. Did the trial court err when it recognized the parties' marriage certificate and declined to recognize the divorce certificate?

Appellant's Brief at 5.[2]

Appellant's first two issues challenge the trial court's ruling with respect to the award of support, contending the trial court improperly assigned him an unrealistic earning capacity based on an expired or invalid

_____

[2] Appellant listed 18 claims of error in his Rule 1925(b) statement. Concise Statement of Errors Complained of on Appeal, 12/6/13. The trial court reviewed and dismissed each of the alleged errors either as ones addressed in its October 8, 2013 opinion or as irrelevant to the matters before the court. *See* Trial Court 1925(a) Opinion, 2/6/14.

J-A34035-14

affidavit of support and issued an unfair support order.[3]  In **Style v. Shaub**,

955 A.2d 403 (Pa. Super. 2008), we explained:

> This Court's standard and scope of review regarding a child support order is well-settled:
>
>> In reviewing an order entered in a support proceeding, an appellate court has a limited scope of review.  The trial court possesses wide discretion as to the proper amount of child support and a reviewing court will not interfere with the determination of the court below unless there has been a clear abuse of discretion.  The function of the appellate court is to determine whether there is sufficient evidence to sustain the order of the hearing judge.  An abuse of discretion is not merely an error of judgment; rather, it occurs when the law is overridden or misapplied, or the judgment exercised is manifestly unreasonable or the result of partiality, bias or ill-will.

**Id.** at 406-07 (quoting **Kotzbauer v. Kotzbauer**, 937 A.2d 487, 489 (Pa.

Super. 2007) (internal citations omitted)).  Similarly, in **Perrotti v.**

**Meredith**, 868 A.2d 1240 (Pa. Super. 2005), which involved an appeal from

a spousal support award, we noted:

---

[3] The trial court ordered Appellant to pay $909 in monthly child support for his two children for the period from September 7, 2012 through January 10, 2013; $909 in monthly child support and $386 in spousal support for the period from January 11, 2013 through August 31, 2013; and $856 in child support plus $89 for spousal support for the period from September 1, 2013 forward.  T.C.O., 10/8/13, at 16.  The trial court noted that arrears stood payable at $190 per month and Appellant was entitled to a $1,907.84 credit against his arrears.  **Id.**  The trial court further noted that the support figures were calculated by the Dauphin County Domestic Relations Section using the earning capacities determined by the trial court and included a reduction to the child support obligation due to obligations for child support payments to the two minor children from Appellant's second marriage, which ended prior to his marriage to Appellee.  **Id.** at n. 7.

> When considering appeals from support orders, "[o]ur standard of review of a trial court's order allows us to determine only whether the trial court committed an error of law or abused its discretion." **Stackhouse v. Stackhouse**, 862 A.2d 102, 104 (Pa. Super. 2004). "An abuse of discretion entails a misapplication of the law or a manifestly unreasonable judgment in light of the record." **Id.** (quoting **Lobaugh v. Lobaugh**, 753 A.2d 834, 835 (Pa. Super. 2000)).

**Id.** at 1242-43. "The fact-finder is entitled to weigh the evidence presented and assess its credibility." **Green v. Green**, 783 A.2d 788, 791 (Pa. Super. 2001) (citation omitted).

The thrust of Appellant's first issue is that the trial court based its support order on an "unrealistic" annual earning capacity of $50,000 assigned to Appellant. Appellant complains that the trial court relied on an expired, invalid immigration affidavit of support from 2005 in which he represented that he had an annual income of $128,000, owned $57,000 in savings, and owned personal assets of over $2.9 million and real estate worth more than $1.8 million. The trial court concluded that the evidence supported the conclusion that Appellant had "failed to obtain appropriate employment commensurate with his earning capacity. I further find that based upon an evaluation of his age, education, training, health, work experience, earnings history and child care responsibilities, that his realistic earning capacity is at least $50,000 per year." T.C.O., 10/8/13, at 9. The trial court explained:

> [Appellant] has a long history in business including working with his Father's export business, and then later managing and owning his own wholesale and later retail food company. He has

the equivalent of a Bachelor's degree plus certificates reflecting continuing education in his field. The record reflects that as of the mid 2000's, [Appellant] and [the export business] were very successful and that [Appellant] was then earning $128,000 per year and holding assets worth $3.7 million, as he swore to in [the 2005 Immigration] Affidavit of Support. (Court Exbt. 7) Though his retail store suffered a flood loss in 2011, it reopened in October 2012. [Appellant] in fact admitted that his claimed earnings from his cash business, as of 2012, of only $800 to $900 per month, did not reflect his own assessment of his earning capacity, which he set as between $30,000 and $39,000. (N.T. 5/17/13 at 66-67, 75, 77) Given his education, earnings history and an extensive and largely successful business background, in particular, [Appellant] is certainly capable of earning at least $50,000 per year.

*Id.*

Based on our review of the evidence, and in accordance with our standard of review, we conclude that there is sufficient evidence to sustain the order of the trial judge. We find no abuse of discretion in the trial court's assignment of earning capacity to Appellant and to awarding child and spousal support on that basis. Appellant's first issue fails for lack of merit.

Appellant next argues that the trial court abused its discretion in rendering "a judgment that was manifestly unreasonable, based on bias, ill will, prejudice or partiality." Appellant's Brief at 33. Appellant suggests that the trial court's order required him to pay 72% of his gross income and did not consider Appellant's living expenses or the support of his other two minor children. He further complains that the trial court assigned an unreasonably low earning capacity to Appellee. These factors together, in

Appellant's estimation, support a finding of a manifestly unreasonable determination. *Id.* at 34. We cannot agree. First, the trial court did consider Appellant's additional support obligations for the children from his second marriage. *See* n. 3. Second, earning capacity is an appropriate measure for determining support obligations. As this Court explained in *Mencer v. Ruch*, 928 A.2d 294 (Pa. Super. 2007):

> It is beyond question that in Pennsylvania, a person's income must include his earning capacity, and a voluntary reduction in earned income will not be countenanced; instead, child support will continue to be calculated based upon earning capacity rather than actual earnings. *See D.H. v. R.H.*, [900 A.2d 922 (Pa. Super. 2006)]. As we observed in *Woskob v. Woskob*, 843 A.2d 1247, 1251 (Pa. Super. 2004) (citations omitted):
>
> > [A] person's support obligation is determined primarily by the parties' actual financial resources and their earning capacity. Although a person's actual earnings usually reflect his earning capacity, where there is a divergence, the obligation is determined more by earning capacity than actual earnings. Earning capacity is defined as the amount that a person realistically could earn under the circumstances, considering his age, health, mental and physical condition, training, and earnings history.

*Id.* at 299.

As explained above, our review of the evidence supports the trial court's determination of Appellant's earning capacity. With respect to Appellee's earning capacity, the trial court determined:

> With regard to [Appellee], I find that based upon her age, education, training, health, work experience, earnings history and child care responsibilities, that as of September 2013, when [Appellee's] youngest child began pre-school, she is realistically able to earn a minimum wage income ($7.25 per hour) full-time (forty-hour week). It is unrealistic to believe she could obtain a

higher paying teaching job, given her lack of Pennsylvania teacher certification and her limited area of teaching expertise (Arabic and Islamic studies). (N.T. 5/17/13 at 32) [Appellee's] job choices are further limited by her less than proficient English skills and her lack of driver's license or access to a car. As such, her employment prospects will be limited due to her need to use public transportation. (N.T. 5/17/13 at 35) In addition, she is still the primary caretaker of the parties' two young children. I further find that prior to her youngest child's attendance at pre-school in September 2013, she should not be assigned an earning capacity due to a lack of access to affordable child care in combination with the job market limitations listed above.

*Id.* at 10. We find there is evidence in the record to support the trial court's determination of Appellee's earning capacity.

Appellant's claim that the trial court's decision was manifestly unreasonable and based on bias, ill will, prejudice or partiality is based on his assertion that the trial court unfairly failed to consider his living expenses and other support obligations as well as the trial court's assignment of a minimum wage earning capacity to Appellee.[4] Because the evidence

_____

[4] Our analysis of Appellant's second issue is based on the contentions included in the Argument section of his brief, beginning at the bottom of page 33 and continuing through page 34. We note that Appellant's brief includes an eleven page "Summary of Argument." Appellant's Brief at 19-29. While Pa.R.A.P. 2118 no longer includes a page limitation for the summary of the argument, the rule does mandate that [t]he summary of argument shall be a concise, but accurate, summary of the arguments presented in support of the issues in the statement of questions involved." Although Appellant is before this Court *pro se*, he is required to comply with our rules governing briefs. *See, e.g., Jiricko v. Geico Ins. Co.*, 947 A.2d 206, 213 n. 11 (Pa. Super. 2008) (*pro se* status does not relieve an appellant of the duty to follow the Rules of Appellate Procedure). While Appellant's eleven page summary violates the spirit, if not the letter, of Rule 2118, we have reviewed the assertions made in his Summary of Argument
*(Footnote Continued Next Page)*

supports the trial court's determination of earning capacity and support, we reject Appellant's assertions. Appellant's second issue lacks arguable merit.

In his third issue, Appellant asserts trial court error for recognizing the parties' Egyptian marriage certificate while declining to recognize the purported Egyptian divorce certificate. The trial court addressed this issue in detail in its opinion. T.C.O., 10/8/13, at 10-14. In essence, the trial court recognized the concept of comity and the limitations of its application,[5] but also noted that "[a] foreign divorce may be attacked collaterally by the opposing spouse where his or her rights are involved; the right to impeach collaterally a decree of divorce made in a foreign jurisdiction by showing fraud or want of jurisdiction has been frequently recognized." *Id.* at 10-11

_(Footnote Continued)_ ─────────────

as well as the Argument itself. We find nothing in the "Summary of Argument" to alter our conclusions regarding Appellant's second issue.

[5] The trial court noted:

> Comity is a recognition which one nation extends within its own territory to the legislative, executive, or judicial acts of another. It is not a rule of law, but one of practice, convenience, and expediency. Although more than mere courtesy and accommodation, comity does not achieve the force of an imperative or obligation. Rather, it is a nation's expression of understanding which demonstrates due regard both to international duty and convenience and to the rights of persons protected by its own laws. Comity should be withheld only when its acceptance would be contrary or prejudicial to the interest of the nation called upon to give it effect.

T.C.O., 10/8/13, at 11 (quoting *Hilkmann v. Hilkmann*, 816 A.2d 242, 245 (Pa. Super. 2003), *aff'd*, 858 A.2d 58 (Pa. 2004)).

(citing **Sargent v. Sargent**, 307 A.2d 353, 355 (Pa. Super. 1973)). The trial court determined that neither party established the requisite domicile in Egypt for an extra-national divorce decree to be enforceable here. **Id.** at 12-14. Further, there was no evidence that Appellee was served with notice of any Egyptian divorce proceeding. Therefore, she lacked an opportunity to defend that action. **Id.** at 14. As a result, comity should not be extended to the purported Egyptian divorce decree. **Id.** **See also Hilkmann**, 858 A.2d at 66 (quoting **In re Christoff's Estate**, 192 A.2d 737, 739 (1963) (an opportunity to defend against an action is a prerequisite for giving respect and deference to a foreign judgment) (additional citations omitted)).

The trial court also addressed Appellant's argument regarding the Egyptian divorce in its 1925(a) opinion. Trial Court 1925(a) Opinion, 2/6/14, at 3. In his seventh alleged error included in his concise statement pursuant to Pa.R.A.P. 1925(b), Appellant asserted, "The trial court unreasonably declined to apply the burden of proof regarding [Appellee's] testimony despite the evidence she presented to court which contradicted her testimony, including her testimony pertaining to her brother not witnessing the divorce in Egypt." Concise Statement of Errors Complained of on Appeal, 12/6/13, at 3, ¶ 7. The trial court responded:

> This court's credibility findings are noted in [the October 8, 2013] Opinion and supported by the record. I would additionally note that [Appellant] on numerous occasions offered contradictory, inconsistent and/or outright false testimony, most notably concerning his educational background (Opinion p. 5), his past income (**Id.** at 6-7), and whether he had filled out

- 9 -

certain immigration documents including the I-864 Affidavit of Support. (*Id.* at 14-15 n.5).

Trial Court 1925(a) Opinion, 2/16/14, at 3.

As noted at the outset, "[t]he fact-finder is entitled to weigh the evidence presented and assess its credibility." *Green*, 783 A.2d at 791. The trial court's disposition of Appellant's Egyptian divorce issue hinged on its assessment of the credibility of the parties. There is no basis for us to disturb the trial court's credibility determinations. Further, we find no error of law on the part of the trial court in concluding that the principle of comity did not extend to the purported Egyptian divorce decree. Consequently, Appellant is not entitled to relief based on his third issue.

Each of Appellant's issues fails for lack of merit. Therefore, we affirm the trial court's October 8, 2013 order. Because we have adopted the Procedural Background and Factual Background from the trial court's October 8, 2013 opinion and have incorporated them in this Memorandum, we direct that a copy of the trial court's October 8, 2013 opinion be attached to any future filings in this case.

Order affirmed.

Judgment Entered.

_____
Joseph D. Seletyn, Esq.
Prothonotary

Date: 3/17/2015

- 10 -

Copies Mailed *10-9-13* *MER* ORIGINAL

F.B.,

    Plaintiff / Obligee

        v.

M.R.,

    Defendant / Obligor

: IN THE COURT OF COMMON PLEAS
: DAUPHIN COUNTY PENNSYLVANIA
:
: No. 441 DR 2012, PACSES
:
:
: SUPPORT

**OPINION**

Before the court are the cross motions for reconsideration filed by the parties in this child and spousal support action. The primary issues concern the parties' incomes and earning capacities, whether this court must recognize an Egyptian divorce decree and whether the defendant is obligated to support plaintiff under an affidavit of financial support he allegedly executed pursuant to immigration law.

**Procedural Background**

Father M.R. and Mother F.B. were married in Cairo, Egypt on March 1, 2005. The marriage was Father's third and Mother's first. Father, the obligor in this support action, is a dual citizen of Egypt and the United States and Mother, the obligee, is a citizen of Egypt. Mother arrived in the United States in September 2005. Father claims they divorced under an Egyptian divorce decree issued January 19, 2006. Mother denied they were divorced asserting the decree a fraud. In any event, the parties lived together until they separated February 5, 2012. They are the parents of two children (dates of birth 1/23/06 and 12/29/09).

Mother filed a complaint seeking child and spousal support March 14, 2012. On May 7, 2012, following a conference in the Dauphin County Domestic Relations Section, I issued an order as recommended by the conference officer, directing that Father pay $425.50 per month child support and $43 per month on arrears (effective March 14, 2012). In recommending the order, the conference officer calculated support under the Support Guidelines assigning monthly net incomes of $1,594 to Father and $0 to Mother.[1] In calculating support, the hearing officer

---

[1] Using those incomes, obligor's child support obligation under the Guidelines was $565 per month.

DATE FILED *10-9-13*

ENTERED BY *MER* 35,

based Father's monthly net income upon his actual 2011 earnings as reflected on his tax return. Mother was assigned no earning capacity because she lacked identification, spoke little English, had only a brief and limited work history and was caring for the parties' two young children, thus not necessitating a child care expense. (See N.T. 7/11/12 at 2-3)

A hearing on spousal entitlement as well as on Father's request for de novo review of the child support amount was held on July 11, 2012. Father argued the support amount should be decreased because it failed to consider Mother's income or the money he spent on his other two children. Mother sought an increase in child support arguing that Father had a significantly higher earning capacity. She also argued that she was entitled to spousal support. At the conclusion of the hearing, the parties reached a settlement whereby Father agreed to pay Mother $1,200 per month in child support and Mother agreed to drop her claim for spousal support. The parties' agreement was set forth in an Order dated July 11, 2012, effective March 14, 2012.

On September 7, 2012, Father filed a petition with the Domestic Relations Section, seeking to decrease his obligation under the agreed order, claiming his gross annual income had dropped to $19,000. On October 2, 2012, I signed the hearing officer's recommended order denying the petition on the basis of no significant change in circumstances since the parties' had reached their agreement. Father sought de novo review and I held a hearing December 11, 2012. The parties agreed at that hearing to incorporate into the record the testimony from the July 11, 2012 hearing. (N.T. 12/11/12 at 6-7)

At the conclusion of the December hearing, I issued an order raising Father's child support obligation to $1,900 per month plus $380 per month on arrears, effective September 7, 2012. This order was based upon consideration of an Affidavit of Support (I-864) Father had purportedly executed as part of his sponsorship of Mother under immigration law (discussed in more detail below). I also indicated to Father that I would provide him with a credit against his support obligation to the extent he could provide proof of any mortgage payments or expenses he paid on the marital home he owned in which Mother was living with the children. Both parties filed timely petitions for reconsideration which I granted January 11, 2013. On April 11, 2013, following a

---

Pa.R.C.P. 1910.16-3. That number was reduced to $425.50 for a multiple family deviation whereby Father was providing direct support for two children from his second marriage. Pa.R.C.P. 1910.16-7.

thorough review of the record, including of transcripts from the prior two hearings, I vacated my December 2012 order and scheduled another hearing on all issues raised in the reconsideration petitions, including the parties' earning capacities. I also granted Mother's request that her claim for spousal support/alimony pendente lite be reinstated as of the date she filed her request, January 11, 2013. The final hearing on this matter was held May 17, 2013, at which both parties testified, chiefly as to their incomes and earning capacities, as well as to the parties' marital status and potential financial obligations Father owed Mother under immigration law and whether it was proper to base Father's child and spousal support obligation on the Affidavit of Support.

## **Factual Background**

### *Immigration Issues and Marital Status*

Father arrived in the United States in 1987 and became a naturalized U.S. citizen in 1991. He and Mother engaged in early 2005 and were married in Egypt on March 1, 2005. At the time, Mother was living in Egypt and had never been to the United States. She did not speak, read or write English. In order for Mother to enter the United States, Father submitted a Visa petition on February 12, 2005 through the U.S. Citizenship and Immigration Services (USCIS) on Mother's behalf, indicating that Mother was applying for entry as an alien (K1) fiancée. (Court Exbt. 7 (I-129F Petition); Father's Answer to Mother's Reconsideration Petition, ¶2) [2] As required by USCIS, Father also submitted an Affidavit of Support (I-134) guaranteeing that he would sponsor Mother financially for up to three years and not allow her to become a public charge. (Court Exbt. 7 (I-134); N.T. 12/11/12 at 15-16) Mother's K1 Visa was issued September 5, 2005, with an expiration date of March 4, 2006. (Exbt. P-1) On September 22, 2005, Mother arrived in the U.S. under her K1 Visa.

Under the terms of the K1 Visa, Mother was to marry Father within ninety days of her arrival (by December 21, 2005) following which the parties could begin the process of submitting her application for a Green Card in order for her to obtain permanent residency status and remain in the U.S. indefinitely, otherwise, she would only be permitted to remain here legally until the expiration of her K1 Visa. It is not entirely clear why the parties sought to obtain a fiancée Visa for Mother when they had already been married in Egypt. Mother explained that

---

[2] All citations to exhibits are for those submitted at the final May 17, 2013 hearing, unless otherwise noted. (See N.T. 5/17/13 at 18-20)

3

she had been told by Father, prior to her arrival, that the Egyptian marriage would not be recognized in the U.S. (N.T. 5/17/13 at 46-47) This court finds this explanation credible particularly where documentary evidence reflects that, they both indicated an initial intention to marry in the U.S. within the ninety-day period but that Father later refused.

Following the parties' marriage in Egypt, both remained there until Father returned to the U.S. on May 15, 2005. (N.T. 5/17/13 at 30) Sometime after the marriage but before his return to the U.S., Father claimed he allegedly discovered that Mother had been engaged to another man and was just using him to obtain a residence in the U.S. (Father's Answer to Mother's Reconsideration Petition, ¶ 4) He claims to have immediately initiated divorce proceedings in Egypt at that time. (Id.) He asserted he also attempted to alert the U.S. Embassy in Egypt to this alleged fraud and to withdraw the K-1 Visa petition, which actions were to no avail. (Id. at ¶ 6) In any event, Father claimed that the Egyptian government eventually issued a divorce decree dated January 19, 2006. (Court Exbt. 5)

Mother denied Father's allegations of a prior engagement as well as that she and Father ever divorced, claiming she was never notified of the divorce proceedings and never given a copy of the decree. (N.T. 5/17/13 at 16, 21) Mother believes that the Egyptian divorce decree submitted by Father to the court is in fact a fake. (N.T. 5/17/13 at 22-23) She elaborated that neither she nor Father were in Egypt on the date the decree indicates they attended the divorce proceeding in person (January 19, 2006) - noting she gave birth to the parties first child in the U.S. just four days later – and that her brother, who is indicated in the decree as having witnessed the divorce, never attended as a witness. (N.T. 7/11/12 at 12-15; N.T. 5/17/13 at 21-22, 30) At the third hearing, Father explained that this divorce was entered in *absentia* which he claimed was a permissible method for obtaining divorce in Egypt. (N.T. 5/17/13 at 52)

Following Mother's arrival in the U.S. on September 22, 2005, Father refused to (re)marry her within ninety days or help her obtain her Green Card. (Father's Answer to Mother's Reconsideration Petition ¶ 8; N.T. 5/17/13 at 15-16) Nevertheless, following her arrival, Father and Mother lived together as a couple for more than six years, including after their alleged divorce, during which time the parties had a second child.

4

Because the parties never married in the U.S., they never formally submitted an application to the USCIS for Mother to obtain her Green Card. (N.T. 12/11/12 at 15) Nevertheless, at the first hearing in July 2012, Mother submitted a series of documents related to the Green Card application process, which this court initially assumed had been submitted to the USCIS.[3] It appears from the testimony and a review of these documents that they were all filled out in Father's handwriting in contemplation of submitting them to the USCIS in order for Mother to become a permanent resident, including those where the applicant is identified as Mother. However, because Father refused to (re)marry Mother within the ninety-day window, none of the documents were ever apparently submitted to the USCIS, including most notably the I-864 Affidavit of Support. (Court Exbt. 6) Father signed that document December 21, 2005, before a notary, agreeing to sponsor Mother and provide her with the necessary support to maintain her at an income at least 125 percent of the Federal poverty guidelines. It was based upon this Affidavit of Support that I issued my December 11, 2012 child and spousal support order, later vacated.

*Income and Earning Capacities*

Father is currently 51 years old. His educational background is somewhat unclear given the evidence offered. At the final hearing, Father denied having attended college though he claimed to have obtained online Bachelor's degrees in international business/finance and corporate psychology. (N.T. 5/17/13 at 68-69) Nevertheless, he admitted that as part of a psychological risk evaluation performed of him in November 2012, in connection with custody litigation, he informed the evaluator that he had attended and graduated from George Washington University with degrees in international business and psychology. (Exbt. P-2) Father also told the evaluator that he earned additional degrees including a Masters in finance from Columbia University in 1992 and a Ph.D. in international law from Harvard in 1996. Id. He denied at the final hearing obtaining either of the post-graduate degrees but stated they were just "online certificates." (N.T. 5/17/13 at 82)

---

[3] These documents, which I re-admitted as Court exhibits at the third hearing, included an I-485 Permanent Residency (Green Card) Application (Court Exbts. 3-4) (with two pages missing), the I-864 Affidavit of Support (Court Exbt. 6) and a G-325A, Biographic Information Form (Court Exbt. 2).

5

After college Father worked periodically for his Father's export business, Rizkcozann Corp., of which he later became CEO and which he claims to have expanded following his Father's death. (Exbt. P-2) Father moved from New York to the Harrisburg area in the 1990's to live with his second wife whom he later divorced in 2004. Id. He has for a number of years operated a grocery store in Steelton, Pa. specializing in international foods which he operates as a cash business. (N.T. 5/17/13 at 70, 71)

In Father's I-134 Affidavit of Support, which he admittedly completed and submitted to the USCIS in 2005, he swore under oath to his financial condition as a sponsor for Mother that he was employed in retail export with Rizkcozann, had an annual income of $128,000, owned $57,000 in savings, and owned personal assets of over $2.9 million and real estate of over $1.8 million. (Court Exbt. 7; N.T. 7/11/12 at 5, 8, 11; N.T. 5/17/13 at 66)

Despite these claims in the I-134 Affidavit of Support, Father nevertheless testified that his average monthly income was only about $1,500 between 2002 and 2011. (N.T. 5/17/13 at 66-67; N.T. 5/17/13 at 66-67, 76) He testified that his income fell considerably, to only $800 to $900 per month, in 2012. (N.T. 7/11/12 at 9) According to Father, his Steelton store was heavily damaged in the flooding caused by Hurricane Irene in September 2011. He testified that although he had insurance and obtained some government loan assistance, he nevertheless suffered a half-million dollar loss. (N.T. 7/11/12 at 7)

As of the first hearing in July 2012, Father was not working but claimed he would be when his store was renovated. (N.T. 7/11/12 at 8) The store re-opened October 3, 2012 and Father anticipated earning a mere $15,000 per year. (N.T. 12/11/12 at 8) At the third hearing, he testified, rather unbelievably, that his gross weekly sales at his grocery store never exceed $880. (N.T. 5/17/13 at 72) Father eventually conceded that the maximum earning capacity he should be assigned as manager of an ethnic food store like the one he owns is $30,000. (N.T. 5/17/13 at 75, 77) He agreed that he was making less than his earning capacity and indicated that he had been looking for jobs in the food management business and had listed his grocery store for sale. (N.T. 5/17/13 at 75) Father also testified that generally his earning capacity maxes out at $39,000, which was the highest salary he claimed to have ever made, in 2004. (N.T. 5/17/13 at 66-67) This testimony was in direct contradiction to the information provided on the I-134

6

Affidavit of Support, Father admittedly signed April 13, 2005, in which he swore that his annual income (in 2004 or 2005) was $128,000. (Court Exbt. 7)

As of the date of the final hearing, Father was living rent free with his former (second) wife and their two teenaged daughters in Middletown, Pa. (N.T. 5/17/13 at 83) Father stressed that he provides financial support for these children. (N.T. 5/17/13 at 84-85) He testified that his former wife's earning capacity is $34,000. (N.T. 5/17/13 at 67) Father also claimed to have been paying all expenses for the house in which Mother was living and that he was allowing her to live there rent free. (N.T. 12/11/12 at 8; N.T. 5/17/13 at 67, 78)

Mother is currently 44 years old. Prior to her arrival in the U.S., she was a teacher in Egypt for fourteen years, primarily teaching Arabic, Islamic studies and the Koran at the middle school level. She has the equivalent of a four-year college degree and an Egyptian teaching certificate. She also started her Master's Degree in Egypt but has not completed it. (N.T. 5/17/13 at 7-9, 26) Since she has been in the U.S., she has not had a job other than helping out Father in his store for five months in 2008 and 2009. (N.T. 5/17/13 at 9)

As of the first hearing, Mother claimed she was unable to work because she did not have the proper paperwork, including a Green Card, but was in the process of obtaining a work visa which she did obtain in the summer of 2012. (N.T. 7/11/12 at 6; N.T. 5/17/13 at 7, 10) Thereafter, Mother unsuccessfully sought a job teaching Arabic at a private Islamic school. (N.T. 5/17/13 at 33-34) As of the final hearing, Mother was taking English classes and intended to complete her Master's Degree. (N.T. 5/17/13 at 11-12) She does not have a driver's license or access to a car. (N.T. 5/17/13 at 35)

As of the last hearing, she was living in a house owned by Father with their two children, currently aged seven and three. She testified that the home was without utility service since Father had ceased paying utility bills as well as monthly mortgage payments. (N.T. 7/11/12 at 21) Mother has received public benefits including SNAP (food stamps) and WIC. (N.T. 5/17/13 at 13) As of September 2013, she intended to enroll the younger child in half-day Head Start preschool. (N.T. 5/17/13 at 6)

7

Father claimed that after coming to the U.S., Mother continued to receive money from her family as well as a teacher's salary from the Egyptian government of $212 per week, noting that under Egyptian law, she cannot be fired. (N.T. 5/17/13 at 55-56) Father supplied original and translated copies of a document allegedly produced from the Egyptian education ministry reflecting her salary through June 2012. (Exbt. R-3; N.T. 7/11/12 at 9; N.T. 12/11/12 at 7) Mother denied receiving any money from her family in Egypt or an income from the Egyptian government. (N.T. 7/11/12 at 10; N.T. 5/17/13 at 14, 56)

## Legal Discussion

The primary questions concern (1) a determination of the parties' incomes and/or earning capacities, (2) whether this court must recognize the Egyptian divorce decree entered against Mother in *absentia*, and (3) whether Father has an independent obligation to support Mother under the I-864 Affidavit of Financial Support signed by Father but never submitted to the USCIS.

### *Income and Earning Capacity*

Father argues that his support obligation should be reduced to reflect his lowered income and that Mother should be assigned an earning capacity. Mother argues that Father should be held to his earning capacity which she asserted was much higher than his claimed income.

Parents have an absolute obligation to support their children and this obligation "must be discharged by the parents even if it causes them some hardship." Mencer v. Ruch, 928 A.2d 294, 297 (Pa. Super. 2007) (citations omitted). "[I]n Pennsylvania, a person's income must include his earning capacity, and a voluntary reduction in earned income will not be countenanced[.]" Id. "Where a party willfully fails to obtain appropriate employment, his or her income will be considered to be equal to his or her earning capacity[,]" not equal to his or her actual earnings. Ney v. Ney, 917 A.2d 863, 866 (Pa. Super. 2007) (citation omitted); Woskob v. Woskob, 843 A.2d 1247, 1251 (Pa. Super. 2004) (determining that "where there is a divergence" between a person's actual earnings and his or her earning capacity, "the obligation is determined more by earning capacity than actual earnings"). Importantly, "the needs of the child must be considered in making any employment decision[.]" Smedley v. Lowman, 2 A.3d 1226, 1228 (Pa. Super. 2010).

8

With regard to earning capacity, the Support Guidelines provide the following guidance:

**(d) Reduced or Fluctuating Income.**

\*     \*     \*

(4) *Earning Capacity.* If the trier of fact determines that a party to a support action has willfully failed to obtain or maintain appropriate employment, the trier of fact may impute to that party an income equal to the party's earning capacity. Age, education, training, health, work experience, earnings history and child care responsibilities are factors which shall be considered in determining earning capacity. In order for an earning capacity to be assessed, the trier of fact must state the reasons for the assessment in writing or on the record. Generally, the trier of fact should not impute an earning capacity that is greater than the amount the party would earn from one full-time position. Determination of what constitutes a reasonable work regimen depends upon all relevant circumstances including the choice of jobs available within a particular occupation, working hours, working conditions and whether a party has exerted substantial good faith efforts to find employment.

Pa.R.C.P. 1910.16–2(d) (4).

I find that based upon the evidence, Father has willfully failed to obtain appropriate employment commensurate with his earning capacity. I further find that based upon an evaluation of his age, education, training, health, work experience, earnings history and child care responsibilities, that his realistic earning capacity is at least $50,000 per year.

Father has a long history in business including working with his Father's export business, and then later managing and owning his own wholesale and later retail food company. He has the equivalent of a Bachelor's degree plus certificates reflecting continuing education in his field. The record reflects that as of the mid 2000's, Father and Rizkcozann were very successful and that Father was then earning $128,000 per year and holding assets worth over $3.7 million, as he swore to in his I-134 Affidavit of Support. (Court Exbt. 7) Though his retail store suffered a flood loss in 2011, it reopened in October 2012. Father in fact admitted that his claimed earnings from his cash business, as of 2012, of only $800 to $900 per month, did not reflect his own assessment of his earning capacity, which he set as between $30,000 and $39,000. (N.T. 5/17/13 at 66-67, 75, 77) Given his education, earnings history and an extensive and largely successful business background, in particular, Father is certainly capable of earning at least $50,000 per year.

9

With regard to Mother, I find that based upon her age, education, training, health, work experience, earnings history and child care responsibilities, that as of September 2013, when Mother's youngest child began pre-school, she is realistically able to earn a minimum wage income ($7.25 per hour) full-time (forty-hour week). It is unrealistic to believe she could obtain a higher paying teaching job, given her lack of Pennsylvania teacher certification and her limited area of teaching expertise (Arabic and Islamic studies). (N.T. 5/17/13 at 32) Mother's job choices are further limited by her less than proficient English skills and her lack of a driver's license or access to a car. As such, her employment prospects will be limited due to her need to use public transportation. (N.T. 5/17/13 at 35) In addition, she is still the primary caretaker of the parties' two young children. I further find that prior to her youngest child's attendance at pre-school in September 2013, she should not be assigned an earning capacity due to a lack of access to affordable child care in combination with the job market limitations listed above.

Finally, Father claims that the Court should include in Mother's income a $212 per week teacher salary she was allegedly receiving from the Egyptian government, as evidenced by the paperwork Father submitted to the court. (Exbt. R-3) Mother denied she received any such salary. Even if this court were to assume the Egyptian documents and translation are accurate and that Mother had been receiving money from the Egyptian government, there was no evidence offered that she was still receiving this income after June 2012, and as such, this court will not include this alleged salary as income to Mother.

*Enforceability of Egyptian Divorce Decree*

Father asserts that he owes Mother no spousal support since the parties were divorced under an Egyptian divorce decree issued January 19, 2006. He supplied a copy of the decree, as well as an English translation of the decree, in support. (Court Exbt. 5) Mother vehemently denied she and Father had been divorced, alleging that the decree was a fraud. In addition, Mother testified she had been provided with no notice of the Egyptian proceeding, rendering it a nullity.

At the outset, this court agrees with Mother that the divorce decree issued in Egypt appears inauthentic and is possibly a fraud. Primarily, the decree recites that both parties attended the divorce proceeding in person on January 19, 2006 and that each made a statement at the proceeding of their intent to divorce. (Court Exbt. 5, pp. 4-5). There was no evidence provided supporting either

10

party's attendance at the Egyptian divorce proceeding. Mother credibly denied being in Egypt on that date, noting that she gave birth to the parties' first child in the U.S. just four days later. Father provided no evidence that he was in Egypt when the decree was issued, which he could have easily established by supplying his passport. This Court additionally notes that the parties continued to live together as a married couple for more than six years following the alleged divorce, including conceiving a second child in 2009, reflecting that Father never considered himself divorced from Mother.

Father clarified at the final hearing that he was not in Egypt when the decree was issued but claimed that divorce is permissible in Egypt in *absentia* and that the divorce is therefore valid. Assuming, for the sake of argument that the decree was validly issued under Egyptian law,[4] it is not enforceable in Pennsylvania for a number of reasons. A judgment issued in a foreign country may be enforceable in Pennsylvania under the principle of comity, described as follows:

> "Although we must give full faith and credit under the mandate of the United States Constitution to a decree of adoption by a court of a sister state if such court had jurisdiction over the parties and the subject matter, judicial decrees rendered in foreign countries depend for recognition in Pennsylvania upon comity ..." In re Christoff's Estate, 192 A.2d 737, 738 (Pa. 1963). ...

> "Comity is a recognition which one nation extends within its own territory to the legislative, executive, or judicial acts of another. It is not a rule of law, but one of practice, convenience, and expediency. Although more than mere courtesy and accommodation, comity does not achieve the force of an imperative or obligation. Rather, it is a nation's expression of understanding which demonstrates due regard both to international duty and convenience and to the rights of persons protected by its own laws. Comity should be withheld only when its acceptance would be contrary or prejudicial to the interest of the nation called upon to give it effect." Somportex Ltd. v. Philadelphia Chewing Gum Corp., 453 F.2d 435, 440 (3rd Cir. 1971), *cert. den.*, 405 U.S. 1017 (1972).

Hilkmann v. Hilkmann, 816 A.2d 242, 245 (Pa. Super. 2003) aff'd, 858 A.2d 58 (Pa. 2004). A foreign divorce may be attacked collaterally by the opposing spouse where his or her rights are involved; the right to impeach collaterally a decree of divorce made in a foreign jurisdiction by

---

[4] Under Egyptian law, as codified within the Hague Convention on divorce and separation, of which Egypt is a signatory, Egyptian nationals can divorce without any requirement of domicile (habitual residency). *The Hague Convention on the Recognition of Divorces and Legal Separations of June 1, 1970*, Art. 2(3) (www.hcch.net). Thus, the Egyptian divorce decree in this case, issued in *absentia,* might have been validly processed under Egyptian law.

11

showing fraud or want of jurisdiction has been frequently recognized. <u>Sargent v. Sargent</u>, 307 A.2d 353, 355 (Pa. Super. 1973).

In order for an extra-national divorce decree to be enforceable here, at least one party must have established a domicile in the issuing country and the defendant must have been personally served with process or appeared in the foreign proceeding. <u>Com. v. Custer</u>, 21 A.2d 524, 528 (Pa. Super. 1941) (divorce decree issued by sister state will not be recognized without personal service on the respondent except in cases where the state granting the divorce is the matrimonial domicile or where the respondent appears and defends the action); <u>Perrin v. Perrin</u>, 408 F.2d 107, 109 (3d Cir. 1969) (a divorce decree may be collaterally attacked for lack of domiciliary jurisdiction or if the defendant was not personally served and did not appear). <u>See</u> <u>also</u>, <u>Sargent</u>, <u>supra</u> and <u>Drakulich v. Drakulich</u>, 482 A.2d 563, 565 (Pa. Super. 1984) (citing <u>In re Christoff's Estate</u>, <u>supra</u>) (the Commonwealth will decline to grant recognition to the decrees of foreign tribunals where "the process of the foreign tribunal was invoked to achieve a result contrary to our laws or public policy or to circumvent our laws or public policy").

With regard to domicile, our courts have recognized the "established and familiar principle" enunciated by the U.S. Supreme Court, "that judicial power to grant a divorce is founded on domicile" and that "in the absence of domicile by at least one of the parties to the action, the Court has no jurisdiction over the cause and its decree will consequently, not be endowed with extraterritorial effect." <u>Com. v. Doughty</u>, 144 A.2d 521, 525-26 (Pa. Super. 1958) (citing <u>Williams v. North Carolina</u>, 325 U.S. 226, 240 (1945)). "An absolute prerequisite to judicial recognition of an out-of-state divorce is that the plaintiff must have resided in the state or country for a minimum period of residency as determined by local authority and that the residency be accompanied by "domiciliary intent", i.e., an intent to remain in the foreign jurisdiction." <u>Sargent</u> at 356 (citations omitted). Such a requirement is jurisdictional and cannot be waived by the acts of the parties. <u>Id.</u> (citation omitted). Both physical presence in the jurisdiction and a then-present intent to permanently reside there are essential characteristics of domicile. <u>Kyle v. Kyle</u>, 6 Pa. D. & C.3d 279, 282 (Pa. Com. Pl. 1978) (citing <u>Stottlemyer v. Stottlemyer</u>, 329 A. 2d 892, 899 (Pa. 1974) and <u>McCloskey v. McCloskey</u>, 366 A. 2d 279, 280 (Pa. 1975)).

Accordingly, for the Egyptian divorce decree to be valid here, Father, as the plaintiff in the divorce action, must prove that he resided in Egypt for a minimum period of residency as determined by Egyptian law and that his residency was accompanied by domiciliary intent. Sargent, supra. He has proven neither. Under Egyptian law, as codified within the Hague Convention on divorce and separation, jurisdiction is established for an Egyptian national seeking divorce in Egypt where Egypt is his "habitual residence" at the time of the proceeding. *The Hague Convention on the Recognition of Divorces and Legal Separations,* Art. 2(4). The term "habitual residence" is interchangeable with "domicile" under the Hague Convention. Id. at Art. 3. Except in circumstances not at issue here, there is no minimal time limitation necessary to establish habitual residence under the Hague Convention / Egyptian law. Nevertheless, Father provided no evidence of a habitual residence there at the time he initiated divorce proceedings. Instead, the record before the court was that Father visited Egypt for a few months in early 2005 in order to marry Mother and initiate Visa proceedings to allow her to travel to the U.S. and join him here. Father has clearly remained a full time domiciliary in the United States since his arrival here in approximately 1987, and of Pennsylvania in particular, since sometime in the 1990's.

Father also failed to produce any evidence of an intent to make Egypt his domicile on or around May 2005 when he allegedly initiated the divorce action. Because Father lacked habitual residence (domicile) within Egypt, or an intent to make it his domicile, the Egyptian decree cannot be recognized in Pennsylvania. See, Sargent at 356 (Mexican divorce decree unenforceable in Pennsylvania where husband went to Mexico for the express purpose of obtaining a divorce without intent to remain beyond the period necessary to come under the jurisdiction of the Mexican courts); Doughty at 526 (Mexican divorce held devoid of extraterritorial effect where no domicile established by defendant) and Taylor v. Taylor, 8 Pa. D. & C.4th 277, 283 (Com. Pl. 1990), aff'd, 599 A.2d 709 (Pa. Super. 1991) (Haitian divorce decree invalid in Pennsylvania absent domiciliary intent on the part of plaintiff and the absence of any notice to or joinder by defendant in the Haitian proceeding); see also Basiouny v. Basiouny, 445 So. 2d 916, 918-19 (Ala. App. 1984) (Alabama court refused to recognize Egyptian divorce decree between Egyptian natives who has been married there in 1969, but who later became naturalized U.S. citizens and permanently resided in Alabama for more than ten years, where

13

husband obtained the divorce after residing in Egypt for only two weeks; husband had clearly not established domicile in Egypt).

The Egyptian divorce decree must also be rejected from recognition in Pennsylvania because there is no evidence that Mother was ever served with notice of the Egyptian proceeding and thus lacked an opportunity to defend that action. Custer and Perrin, supra. "An elementary and fundamental requirement of due process in any proceeding which is to be accorded finality is notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." Mullane v. Cent. Hanover Bank & Trust Co., 339 U.S. 306, 314 (1950). Mother's lack of notice of the Egyptian proceeding is fatal to Father's attempt to enforce the Egyptian divorce decree here (absent her appearance in Egypt at that proceeding). For this reason, and the others cited above, it is clear under Pennsylvania law that comity cannot be extended to this extra-national divorce decree.

Accordingly, for the reasons set forth above, the parties remain married and Father is responsible to provide spousal support to the extent required under Pennsylvania law.

### Affidavit of Support (I-864) – Legal Effect

Father challenges my finding, following the second hearing, that he owes Mother an independent duty of spousal and child support pursuant to the I-864 Affidavit of Support he filled out and signed before a notary. I agree. As noted, Mother provided the court with a copy of that document (which she obtained from his files) upon which I based the December 11, 2012 order of support. As noted, I later vacated that order. The evidence presented confirms that while Father filled out the I-864 Affidavit of Support, signed it and had it notarized, Father never submitted it to the USCIS because he and Mother never (re)married and pursued a Green Card application with the USCIS.[5] As such, Father never became obligated to support Mother under its terms. Accordingly,

---

[5] Father stated at the second hearing that the I-864 Affidavit of Support submitted by Mother had been stolen by her from his office along with a number of other papers. (N.T. 12/11/12 at 15) At the third hearing, however, he asserted the I-864 was a complete forgery that Mother had filled it in her handwriting. He also denied signing it, though he conceded that the signature on the form looked like his. (N.T. 5/17/13 at 91-92). Based upon the testimony and a review of the documents submitted to the court, it is clear beyond any peradventure that the writing on the I-864 (Court Exbt. 6), as well as the other documents related to the request for a Green Card (Court Exbts. 2 (G-325A, Biographic Info.) and 3-4 (I-

14

Father's duty to provide spousal support will be determined in this case solely under the Pennsylvania Support Guidelines.[6]

## *Support Calculation*

There are three support periods applicable here: (1) child support only from September 7, 2012, the date Father filed for modification of the support award, through January 10, 2013; (2) child and spousal support from January 11, 2013, the date Mother requested spousal support / alimony pendente lite, through August 31, 2013; and (3) child and spousal support from September 1, 2013, the date Mother is attributed an earning capacity, to date.

For the purpose of calculating support, and based upon his assigned earning capacity of $50,000, Father's monthly net income (filing as a single taxpayer) is $3,181 for all relevant time periods. Mother's earning capacity is assigned as zero for the period between September 7, 2012 and August 31, 2013. Effective September 1, 2013, her monthly net income, based upon a full time minimum wage job (filing taxes as a head of household with two children), is $1,111.

Applying these incomes to the first time period, Father owes Mother child support of $909 per month under the Support Guidelines. For the second time period, Father's monthly support

---

485, Permanent Residency (Green Card) Application), which Father suggests are forgeries, are all filled in in Father's handwriting. The handwriting on these documents is identical in every respect to the I-134 Affidavit of Support Father admittedly submitted as part of the K1 fiancée filings. (N.T. 12/11/12 at 15-16; N.T. 5/17/13 at 65-66; Court Exbt. 7 (I-134 Affidavit of Support)) The record further established that Mother, at the time (in 2005 and 2006), did not speak or write in English. Her signature does appear on a few of the documents; however, her signature is noticeably distinct from the other handwriting (printing) on the forms, which is clearly Father's. Mother credibly testified that she simply signed documents Father presented to her. (N.T. 5/17/13 at 17-18)

In light of this evidence, this Court finds that Father's claim to this Court that the un-submitted I-864 Affidavit of Support was not filled in by him in his handwriting or signed by him with his signature to be utterly false.

[6] Had the I-864 Affidavit of Support been submitted as part of Mother's application to obtain permanent residency, Father, as the sponsor, would have been contractually obligated to provide economic support to Mother, the sponsored immigrant, at 125% of the federal poverty level applicable to the size of Mother's household until any of the following occurred: Mother could be credited with 40 quarters of work, the death of Father or Mother, or upon Mother leaving the U.S. See Court Exbt. 6. The contractual obligation arising under an I-864 Affidavit of Support is enforceable in any court by the sponsoree, the federal government, any state government and any governmental agency that provides the sponsoree a means-tested public benefit. Love v. Love, 33 A.3d 1268, 1273 (Pa. Super. 2011) (citation omitted). In the case where the sponsor and sponsoree are married, this obligation is independent of spousal support and survives divorce. Id. In the context of a spousal support proceeding, the Affidavit of Support may be considered a basis for deviation from the presumed baseline amount awarded under the guidelines. Id. at 1275.

15

obligation is $909 for the children and $386 for spouse. For the third time period, Father's monthly support obligation is $856 for the children and $89 for spouse.[7] Father is entitled to a $1,907.84 credit against his arrears for payments he proved he made on the home in which Mother and the children have lived. (N.T. 5/17/13 at 87-88, 97-98)

Accordingly, I enter the following:

## ORDER

AND NOW, this __8th__ day of October 2013, it is directed as follows:

(1) effective September 7, 2012 through January 10, 2013, Father's monthly support obligation for two children is $909;

(2) effective January 11, 2013 through August 31, 2013, Father's monthly support obligation is $909 for the children and $386 for spouse; and

(3) effective September 1, 2013 to date, Father's monthly support obligation is $856 for the children and $89 for spouse.

Arrears stand payable at $190 per month. Father is entitled to $1,907.84 credit against his arrears.

BY THE COURT:

_____
Jeannine Turgeon, Judge

Distribution:
Mohammed Rizk – P.O.B. 220, Highspire, PA 17034
Rachel Haynes Pinsker, Esq. - YWCA Legal Ctr., 112 Market St Flr. 2, Harrisburg, PA 17101
Kim Robison – Direction-Dauphin County Domestic Relations

---

[7] All support figures were calculated by the Dauphin County Domestic Relations Section using the income figures noted above and applying the formulae set forth in the Support Guidelines. See Pa.R.C.P. 1910.16-4. All three support calculations include a reduction to Father's support obligation due to his financial obligation to the two minor children he has with his second wife, pursuant to Pa.R.C.P. 1910.16-7(b). For purposes of making that multiple family deviation, the Domestic Relations Section calculated Father's support to his second family using an assigned earning capacity to the former wife of $34,000.

16